## UNITED STATES v. KLEIN et al.
### No. 10210.

United States Court of Appeals
Seventh Circuit.

March 6, 1951.

Rehearing Denied April 25, 1951.

Myer H. Gladstone, Chicago, Ill., for appellants.

Howard L. Doyle, U. S. Atty., Marks Alexander, Asst. U. S. Atty., George R. Kennedy, Asst. U. S. Atty., all of Springfield, Ill., Harry M. Weakley, Asst. U. S. Atty., Springfield, Ill., on the brief, for appellee.

Before MAJOR, Chief Judge, and KERNER and FINNEGAN, Circuit Judges.

FINNEGAN, Circuit Judge.

This case arises out of an indictment presented by the Grand Jury in the Southern District of Illinois, Southern Division, containing six counts.

Count one charged Edward Klein, Peter Dounias and Frederick Pedote as principals, with the robbery of a postal substation and with the use of a dangerous weapon in connection with such robbery. Count two charged the defendants William Ryan, Harry Hartzell and Harvey Green with being accessories after the fact to such armed robbery of said postal substation. Count three charged the defendants named as accessories after the fact

with misprision of felony in connection with such armed robbery.

Count four charged the defendants Klein, Dounias and Pedote as principals with robbery of the same postal substation without the addition that a dangerous weapon was used in connection with said robbery. Count five charged the defendants Ryan, Hartzell and Green as accessories after the fact to such unarmed robbery. Count six charged Ryan, Hartzell and Green with misprision of felony in connection with such unarmed robbery.

The case was transferred to Peoria, Southern District of Illinois, Northern Division, for trial.

Frederick Pedote, a defendant named as a principal in counts one and four, pleaded guilty and appeared and testified as a witness for the Government.

On the trial the jury found the defendants Edward Klein and Peter Dounias guilty as charged on count one and not guilty on count four. The defendants Ryan and Hartzell were found guilty on counts two and three, and not guilty on counts five and six. The defendant, Harvey Green, was found not guilty.

After motions for a new trial, and in arrest of judgment were overruled, the defendants Edward Klein and Peter Dounias were sentenced to the custody of the Attorney General for a period of twenty years to be served in a penitentiary of the United States.

This appeal is prosecuted by Edward Klein and Peter Dounias, who contend that their conviction should be reversed because (a) of alleged error committed in connection with the evidence of Estelle Klein and her impeachment or contraction; (b) because of improper argument to the jury by the attorneys for the prosecution; and (c) because of an improper instruction given the jury by the trial court.

On behalf of Peter Dounias, it is also urged that there is no evidence that he was armed at the time of the alleged robbery.

Although it is not formally contended that the evidence is insufficient to support the verdict, the appellants do insist that the evidence is conflicting and that the case is close on the facts. Hence a brief statement of what was established by the testimony may give point to their contentions and serve to assist in determining their validity.

United States postal substation No. 11, was located in a drug store at 394 Callendar Avenue, in Peoria, Illinois, and was owned and operated by one Chester W. Wood. On Sunday, March 13, 1949, at about 9:10 in the evening, the substation was the scene of a robbery—postal funds to the amount of $875.52, and certain registered letters, were taken by the robbers, who also appropriated a ring and watch belonging to Chester Wood, as well as personal funds and other articles belonging to Wood and friends of his then present.

At and immediately prior to the robbery there were only three persons in the drug store: Mr. Wood, the owner; Denzel Jines, a clerk, and Paul Bontemps, a friend.

Shortly after nine P.M. Paul Bontemps, who had been visiting in the store for about two hours, was playing a small radio toward the rear of the store. Chester Wood was using a telephone, located on a dividing wall separating the front of the store from a rear storeroom, with his back to the only store entrance. Denzel Jines, the clerk, was behind the ice cream counter near the front of the store.

Two men entered the drug store. One remained near the front of the store, while the other waving a gun in his hand ordered the clerk, Jines, to "get in the back room." He then ordered Wood to hang up the telephone, and when Wood failed to obey his command, struck him over the head with the gun. Jines was standing immediately beside the man with the gun and was again ordered to go with Wood to the rear room. He then pointed the gun at Bontemps and ordered him into the rear room.

On the trial both Jines and Bontemps identified Edward Klein as being the armed robber.

Jines was then ordered by the robber identified as Klein to go to the front of the store and turn out the lights. He com-

plied with the order, and while doing so had an opportunity to observe the second robber who threatened to "bash his head in." On trial Jines identified Peter Dounias as the second robber.

The person identified as Klein took from the person of Paul Bontemps his wallet containing seven dollars, and demanded and received from Chester Wood his watch, and a diamond ring valued at $500.

The robber identified as Dounias came and took a cardboard box, given him by Klein, and after emptying the box returned to and remained in the front part of the store where the safe containing registered letters was located.

The robbery consumed about fifteen or twenty minutes. Wood, Bontemps and Jines were locked in the toilet in the rear of the store, and the robbers took their departure. Postal funds in the sum of $875.52 were taken from the safe, together with the registered letters placed there for safe-keeping. A ring and watch belonging to Chester Wood, Bontemp's wallet with seven dollars enclosed, and also funds and other personal property of Wood, together with the small radio, which Bontemps had been operating, were taken.

Chester Wood, after having been struck on the head, could not see because of blood flowing into his eyes and over his glasses, and consequently did not identify either of the robbers.

The co-defendant and accomplice, Frederick Pedote, testified that he, Klein and Dounias, who had known each other for about a year, met in Peoria at about four P.M. on March 13, 1949. They drove around in Klein's automobile and discussed, among other things, the Chester Wood drug store, and the fact that he had a valuable diamond ring. He said that the defendant Dounias had in his possession during the drive a 45 caliber gun. Pedote stopped at his hotel and got a 38 caliber gun, which he gave to Klein. They decided that because Pedote lived in Peoria he would drive the car and wait outside while Klein and Dounais robbed the drug store.

Pedote's story was that at the time of the robbery he was in the car a short distance away from the drug store and saw the lights go out. Then Klein and Dounias came out of the drug store with a radio, and a cardboard box containing various items, and re-entered the car, and the three of them drove to a tavern and tourist court, called the Chicken Shack, on the outskirts of Peoria. During this drive Klein told Pedote about having to strike Chester Wood on the head. Co-defendants Ryan and Hartzell were contacted by telephone and came at once to the Chicken Shack, where they were apprized of the robbery, and the proceeds derived from the robbery were then divided equally. The postal envelopes and cardboard box were burned by Harvey Green, operator of the Chicken Shack, while defendant Klein took the diamond ring and the radio, in addition to his share of the money. Certain other articles were thrown into the Illinois River. Klein then stated that he was returning to Chicago at once and left in his car, and Dounias and his co-defendants Ryan and Pedote left a short time later, around midnight, for Hot Springs, Arkansas, in Ryan's Cadillac automobile, remaining in Hot Springs for nine or ten days. Later, Klein gave Dounias and Pedote $150 each as their share in Chester Wood's diamond ring.

Neither of the defendants now appealing took the witness stand to testify in their own behalf. The defendant Klein introduced evidence, consisting of the testimony of members of his family and his wife's family and one friend, to the effect that he was in Chicago on the night that the robbery was committed.

No evidence was introduced on behalf of the defendant Dounias.

Defendants contend that the trial court erred in allowing cross-examination of the witness Estelle Klein on matters they claim were not brought out on her direct examination—having particular reference to certain long distance telephone calls.

This witness was the wife of the defendant Edward Klein. On her direct examination she testified concerning the

association of her husband with his co-defendants, Dounias and Pedote, and of her own acquaintance with them, and with William Ryan. She was the first of six witnesses whose testimony tended to establish an alibi for the defendant Edward Klein. She testified that he spent all of Sunday, March 13, 1949, in Chicago, and on the evening of that day accompanied her to the home of his sister where, they with friends and relatives, watched a television broadcast of a hockey game. On cross-examination, she testified that so far as she knew her husband never was in Peoria, and denied specifically that on February 23, 1949, she had personally put in a long distance call from her home to a Peoria Hotel, and denied that her husband had ever phoned her from Peoria.

Recalled for further cross-examination she said that, so far as she knew, her husband had no business association with Dounias, Ryan, Pedote and Hartzell. When shown various records of the telephone company, purporting to show calls between her home and different defendants shortly before and after the time of the robbery, she persisted in her testimony and said that such records did not refresh her recollection.

It is now claimed that as to these matters her answers on cross-examination are conclusive on the Government because the matters inquired into were collateral and irrelevant to the issue.

Mrs. Klein in her testimony not only furnished an alibi for her husband for the period of the time involved, but went further and said that her husband had never been in Peoria. This flatly contradicts other testimony in the record, and was, apparently, in direct conflict with information in possession of the prosecution, which could be produced, and which would tend to indicate that her husband had been in Peoria a few weeks before the robbery and that she herself had been in telephone communication with him.

It is said in Alford v. United States, 282 U.S. 687–694, 51 S.Ct. 218, 220, 75 L.Ed. 624:

"The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted. * * * no obligation is imposed on the court, * * * to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self incrimination * * *. There is a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him."

■ When evidence goes to challenge directly the truth of what the witness has said about matters material to the issue on trial, it cannot be called "collateral." Such evidence is admissible by way of impeachment or contradiction without regard to whether the witness contradicted has been asked about it. Ewing v. United States, 77 U.S.App.D.C. 14, 135 F.2d 633.

■ Under the circumstances disclosed in this record, it is our opinion that Estelle Klein was properly cross-examined as to her husband's presence in Peoria and as to her knowledge thereof, and as to the telephone calls between her home and places frequented by the defendants.

■ In connection with the contentions that the closing arguments of the Government attorneys were inflammatory and improper, we must note that no specific objection was interposed or urged on the trial. It is hypercritical to say that because, in discussing testimony and its effect, a district attorney uses the words "I know, etc." he is thereby testifying on behalf of the prosecution. This is especially true in the face of the record here before the court, where the prosecutor said at the opening of his argument: "Let us analyze the evidence in this matter. Let us use our common sense on it and try to solve the problems the same as you would solve a problem that arises in your own home or your own life, by common sense."

In most instances when the expression "I know" was used, some explanation of the means of knowledge was generally added. For example, when it was said: "I know you can drive from Chicago from 12 o'clock noon to four o'clock in the afternoon," it was added immediately "because we had a man on the stand who did it."

And again, when he said: "I know Estelle Klein is a liar" he added: "because other people whose veracity can't be doubted have told us from the witness stand that Eddie Klein wasn't in Chicago watching a television set that night but was down here with a gun in his hand, etc."

Under the circumstances, and especially in view of the fact that no adequate objection was interposed on the trial, we are unable to conclude that the argument of the Government attorney was inflammatory and improper.

■ The third contention of appellants involves the instructions given by the trial court to the jury. The record shows that when the instructions to the jury were concluded the Court asked:

"Are there any suggestions?", Defendants' attorney responded: "We are satisfied with your instructions, very satisfied with them."

The Government attorneys suggested an additional instruction. The Court thereupon said:

"My attention has been called to the fact that I may have avoided suggesting one particular instruction.

"If the jury believe from all the evidence in the case that any particular witness has perjured himself or testified falsely, you are entitled to disregard the entire testimony of that witness unless corroborated by other credible evidence in the case."

"I think that covers it, gentlemen. Any exceptions?"

The attorneys for the Government and for the defendants then expressly stated that there were no exceptions to the Court's instructions, and the jury retired to consider its verdict.

Rule 30 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., provides in part: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objections."

While it is true that rule 52(b) of the Federal Rules of Criminal Procedure provides that plain errors or defects affecting substantial rights may be noticed, although they were not brought to the attention of the trial court, we are convinced that on this record there is no such substantial prejudicial error as to require the modification of Rule 30. United States v. Raub, 7 Cir., 177 F.2d 312–315.

Our conviction in this regard is fortified by the fact that in his argument to the jury one of defendants' counsel said:

"On the strength of Mr. Pedote's testimony the prosecution in this case would ask you, and have asked you and will ask you after I sit down to return a verdict of guilty against these defendants.

"In connection with his testimony it is the law that when any witness wilfully testifies falsely to any material fact that you may totally disregard his testimony in its entirety except in so far as it is supported by other believable evidence and testimony and I believe the court will instruct you that this is the law."

Manifestly the defendants and their attorneys were aware, when the trial court completed his instructions, that the charge as given contained certain verbal inaccuracies. Nevertheless they said they were satisfied and stated that they wished to preserve no exception. Under such circumstances they are in no position to complain.

In connection with all of the contentions urged by the defendants as grounds for the reversal of the judgment of the District Court, we may well paraphrase what was said by this Court in United States v. Kadison, 7 Cir., 145 F.2d 525.

On this appeal we are asked to consider the admissibility of certain evidence, the propriety of the closing arguments on behalf of the Government, and the correctness of the court's instructions to the jury. No objection was made below on these grounds. These issues are presented here for the first time, but we .are urged to consider them and to overlook the fact that they were not raised at the trial. True, we may consider, on appeal, errors not raised below if the errors are obvious or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings. United States v. Atkinson, 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555. No such showing has been made in this record. The alleged errors are far from obvious. The defendants were represented at the trial by distinguished counsel, one of them a former states attorney of an Illinois county, and the other a former assistant district attorney of the United States. They accepted the court's instructions without suggestion or exception. No specific objections were urged as to the admissibility of any evidence. Upon such a record we consider only the sufficiency of the evidence to support the verdict of the jury.

So far as the contention made on behalf of the defendant Dounias is concerned, we are of opinion that the decisions of this court in Melling v. United States, 7 Cir., 25 F.2d 92, and O'Brien v. United States, 7 Cir., 25 F.2d 90, are decisive against it. There is the evidence of his accomplice that this defendant had in his physical possession a 45 caliber gun immediately before the robbery. He was present at and assisted in the actual robbery. It is true that the two witnesses who identified him did not say that he had or that they saw he had a gun during the robbery, nevertheless the jury might have found that he was actually armed at that time. Legally, of course, he was a principal, present at and aiding in the commission of the crime. Title 18 U.S.C.A. § 2(a).

Our review of the record convinces us that the judgment of the District Court should be affirmed.